**Carmen Gloria MARIN, on behalf of Javier Meléndez; Ramon Bosque Lugo on behalf of Ramón Bosque Pérez, Plaintiffs,**

v.

**UNIVERSITY OF PUERTO RICO et al., Defendants.**

**Civ. No. 137–72.**

United States District Court, D. Puerto Rico.

May 24, 1972.

Pedro J. Varela, Legal Services, Inc., Rio Piedras, P. R., for plaintiffs.

M. Martinez Umpierre, Arecibo, P. R., and Alberto Picó, San Juan, P. R., for defendants.

## MEMORANDUM OPINION

TOLEDO, District Judge.

This is an action filed pursuant to the Civil Rights Act, Title 42, United States Code, Sections 1981, 1983 et seq., seeking injunctive and declaratory relief. It seeks to enjoin the University of Puerto Rico and its officials from applying provisions of the General Student Regulations which regulate the conduct, plaintiffs allege, of over sixty thousand students, at four campuses and four regional colleges throughout Puerto Rico and which comprise all public state university students in this jurisdiction.

Plaintiffs represented by their parents and/or custodians, claim that the provisions of the student regulations [1]

I. The provisions of the General Student Regulations applicable to the case herein are the following:

Article 3: *Extracurricular Activities at the University.*

A. University Students will have the right of expression, association, free association, to formulate petitions to auspiciate and celebrate activities of all kinds according to the Law and the University Regulation, as long as it does not present conflicts with other duly authorized activities, does not interrupt the institutional work, or violate the norms indicated to safeguard the order, security and normality of the institutional tasks.

B. The use of any place at the University in relation to celebration of acts, reunions or ceremonies requires the previous authorization by the Chancellor or Director of the corresponding institutional unit or of the persons in which this has been delegated. To the ends that there will be no interruption of the education tasks nor the good instructional order and without it constituting the power of previous censorship, the auspiciators of said acts will be responsible of the means used to publicize and for the adoption of the necessary measures to maintain the order and security therein.

C. The students will effectuate their extracurricular activities within the University in a free and responsible manner. These activities will be subject to the following norms:

1) Students may celebrate any act, meeting or ceremony and invite any participant to said acts which they wish to listen to about any subject of their interest without it implying the solidarity of the institution with the criteria expressed. These acts will be held at the university auditoriums or in any adequate room, except in exceptional cases, when the nature of the act or ceremony require special arrangements.

2) The peaceful celebration of pickets, marches, meetings and other kinds of demonstrations within the University Campus constitute a legitimate means' of expression. With the purpose of harmonizing the exercise of this right with the special demands of the institutional order and the necessary respect for the rights of other members of the academic community, it is indispensable, notwithstanding, its careful reglementations.

The activities referred to, will not thus be permitted within the University campuses, and its orginal colleges, except under the following conditions.

(a) The celebration of pickets, marches, meetings and other demonstrations at any places of the University will require previous notification and consultation of the Chancellor of the corresponding campus or of the persons to which this has been delegated, which person will approve the place, hour and the day in which these acts will take place in a way that they will not interrupt the educational tasks and the good order of the university.

(b) The acts referred to will be held in such a way that they will not affect the good normal functioning of the operations and procedures of the university.

(c) The acts referred to should not be turned into acts of coercion against other persons, nor resort to or incite violence in any form.

(d) No person or group of persons foreign to the University of Puerto Rico will carry out the acts referred to within the university premises or property of the University.

(e) Pickets or marches will not be held inside any building of the University.

(f) Mass pickets will not be permitted. When it is deemed proper for the due observation or the norms herein provided, the permits to be issued will specify the

are, on its face and as applied to them, unconstitutional since they violate the First, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States by directly violating or imposing prior restraints or infringing upon plaintiffs' rights to freedom of speech, association, peaceful assembly, the right to petition the government for the redress of grievances, due process and equal protection of the laws. It is further alleged that the sections of the General Student Regulations are vague and overbroad in such a way as to constitute an impairment of constitutionally protected conduct. Plaintiffs were full-time students of the Arecibo Regional College of the University of Puerto Rico until they were suspended for one year by the Dean and Director after an administrative hearing had taken place in which they had been represented by counsel. They also claim that this is a proper case for determination by statutory three-judge court, as prescribed by 28 United States Code, 2281 et seq., on the ground that the student regulations herein involved, being of statewide applicability, are in violation to the Constitution of the United States.

Upon the verified complaint and affidavit of petitioners. Javier Meléndez and Ramón Bosque Pérez, this Court issued on February 9, 1972, an Order to Show Cause under which defendants, the Council of Superior Education, Amador Cobas and José Norberto Morales, were requested to appear on this Court and bring forward reasons on why plaintiffs' request should not be granted.

---

maximum number of persons which may form the picket line.

(g) It will be the responsibility of every student not to hinder the carrying out of the acts referred to, or the exercise by others, in any other form of their rights to free expression. The simultaneous counterpicket will not be allowed.

(h) Infractions to these rules will be subject to pertinent disciplinary sanctions including the possibility of suspension and expulsion. In case there exists a clear and imminent danger that the exercise of the rights herein recognized will substantially and materially interfere with the institutional order the directors of the University Campuses and of the regional colleges, may, by written and fundamental resolution, forbid for a determined period susceptible of time extension, the holding of these acts in the respective jurisdictions. The President of the University will have the same right in relation to the institution as a whole. In both cases the corresponding appeals determined by law will proceed. In case that the power here conferred to the respective officers of the University of Puerto Rico be exercised this prohibition cannot be extended for a period over thirty (30) days unless the council authorizes the extension of same for a longer period.

The issuance of any permit under this regulation will not be utilized as an instrument for the prior censorship of legitimate activities by the student body.

Article 10: *About Student Conduct Subject to Disciplinary Sanctions*

A. The following acts constitute violations of the essential norms to the order and to the University coexistence and are subject to disciplinary sanctions.

1) Violations to the General Students Regulations or to the Campus Regulations.

2) Lack of honesty in relation to the academic or other action toward that end.

3) Alteration or falsification of qualifications, records, identification cards or other official documents.

4) Improper or disrespectful conduct in the classroom or campus.

5) Breach of the peace on improper conduct outside the campus when action in the name of the University or in representation of its student body or in activities celebrated under the auspices of the University.

6) To interrupt present obstacle or perturb the regular tasks of the holding of acts or functions duly authorized. The previous rule is equally applicable when the acts of interruption, obstaculization or perturbations are realized out of the campus.

7) The carrying out within the University of acts not authorized by the corresponding University officials.

8) The publication or diffusion within the University premises of libelous or obscene material.

9) To assume without previous authorization the representation of the University, its Student Councils or any recognized student society.

10) Causing malicious damage to university property.

Defendants filed a motion to dismiss the complaint alleging, in substance, that this Court did not have jurisdiction to entertain this action since plaintiffs had not exhausted the available administrative remedies, the case was not ripe for adjudication, the abstention doctrine was applicable in this case, there was no substantial constitutional claim to convene a three-judge court and that the regulations were not of statewide applicability, a three-judge court not being necessary.

During the hearing that took place to argue the motion to dismiss, defendants also expounded the fact that the Consejo de Educación Superior was not a juridical entity, not subjected to be sued. Plaintiffs were in accord to dismiss the complaint against the Consejo de Educación Superior. After the hearing, the parties were requested by the Court to submit memoranda sustaining their positions. Both parties have so done.

## I. THE FACTS

The facts of the case as stated in plaintiffs' complaint are the following:

At noon, on November 16, 1971, plaintiff Javier Meléndez entered the reading room of the Regional College's library and very briefly addressed other students there present stating that he would withdraw his candidacy to the presidency of the Student Council since he understood the proceedings to be vitiated by the acts of the administrators in charge of the elections. Plaintiff Ramón Bosque and other students stood by him while he spoke. There is no other place at the Regional College where students habitually congregate. The following day, November 17, both plaintiffs were summarily suspended from the University until December 7, 1971 under section 16 of the Regulations for supposed violations of Article 10A(1), (4), (6), (7) and Article 3 C–2(a).

On December 2, 1971, both plaintiffs entered a conference room where defendant José Norberto Morales was meeting with several members of the Student Council. Plaintiffs had been informed by the President of the Student Council that the student members of the Board of Discipline would be elected at that meeting. Defendant José Norberto Morales refused to answer plaintiffs' questions as to the nature of the meeting and ordered them off the premises on the grounds that they had been summarily suspended from the University. Plaintiffs left the meeting when Pedro Salicrup, the President of the Student Council, informed them that it was an informal exchange of ideas at which no decision concerning the membership of the Board of Discipline would be taken. On December 3, 1971, because of the abovementioned acts the summary suspension of both plaintiffs was extended until February 4, 1972. This extension of summary suspension was based on charges of violations of Article 10A(1), (4) and (6) of the Regulation.

On December 8, 1971, plaintiffs participated together with other students in a picket to protest their summary suspension from the University. The picket was peaceful and orderly and was held at lunchtime on the public thoroughfare in front of the Administration Building of the Arecibo Regional College. Both plaintiffs addressed the public with a loudspeaker and refused to disband the meeting or surrender the loudspeaker to defendant Morales on the grounds that they were speaking at a public meeting on a public thoroughfare. Associate Dean Generoso Trigo asked to be allowed to use the loudspeaker to address the public, plaintiffs allowed him to do so and he spoke for several minutes. On December 23, 1971, plaintiffs were charged with violations 3 C2(a), 3 C2(b) and Article 10A(1) (4) (6) and (7).

On November 29 and 30, 1971, plaintiff Ramón Bosque distributed leaflets to fellow students on their way to vote, denouncing the elections as fraudulent. No disorder or violence was registered. Associate Dean Generoso Trigo was present on both occasions and did not advise plaintiff that his actions were deemed to interrupt the electoral proc-

ess. Plaintiff was charged with violations of Article 10A(1), (4), (6) and (7). A hearing before the Board of Discipline was held on January 15, 1972, at which plaintiffs appeared with counsel. The Board entered its report January 18, 1972 and declared several of the charges to have been proved without stating the specific actions or words which were found to be disruptive or insulting.

On January 21, 1972, defendant José Norberto Morales suspended both plaintiffs from the University until December 31, 1972.

## II. EXHAUSTION OF STATE REMEDIES

■ As was expressed hereinbefore, this is an action filed under the Civil Rights Act of 1871, Title 42, United States Code, Section 1983. The purpose of the statute in question was manifold. Namely, to override certain kinds of state laws, to provide a remedy where state law was inadequate, to provide a Federal remedy where the state remedy, though adequate in theory, was not available in practice and, also, to provide a remedy in the Federal Courts supplementary to any remedy any state might have. Monroe v. Pape, 365 U.S. 167, 171 et seq., 81 S.Ct. 473, 5 L.Ed.2d 492.

On the other hand, and until recently, the accepted practice had been that a plaintiff complaining to a Federal Court of the violation of a constitutionally protected right by a state officer, must exhaust state administrative remedies although not judicial ones. See: Note, "Exhaustion of State Remedies under the Civil Rights Act", 68 Colum.L.Rev. 1201, 1206 (1968). However, recent Supreme and Federal Court decisions have been thought to cast serious doubt on the applicability of this important principle in cases brought under the Civil Rights Act. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed. 2d 647 (1967); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 Note

4 (1968); Houghton v. Shafer, 392 U.S 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); Wilwording v. Swenson, 404 U. S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569, No. 70–5082, decision of the Supreme Court entered on April 3, 1972. See also, Eisen v. Eastman, 421 F.2d 560 (2 Cir. 1969); Moreno v. Henckel, 431 F.2d 1299 (5 Cir. 1970), Sostre v. McGinnis, 442 F.2d 178 (2 Cir. 1971); Hobbs v. Thompson, 448 F.2d 456 (5 Cir. 1971), and Vistamar, Inc. v. Vazquez, 337 F.Supp. 375 (D.C.P.R.1971).

In King v. Smith, supra, Alabama's stepfather rule, which denied AFDC payments to children if their mother cohabited with an able-bodied man, was challenged on the grounds that it violated the equal protection clause. Since appellees sought injunctive relief restraining defendants from the enforcement of a statewide regulation on the ground of its unconstitutionality, a three-judge court was convened by the district court. Appellants argued that the three-judge district court erroneously adjudicated the merits of the controversy without requiring appellees to exhaust administrative remedies. The Supreme Court dismissed this argument in a footnote citing Monroe v. Pape, supra; Damico v. California, supra, and McNeese v. Board of Education, supra. See 392 U.S. 309, at 312, 88 S.Ct. 2128. In doing so, it established that an action under the Civil Rights Act, Title 42, United States Code, Section 1983 and Title 28, United States Code, Section 1343, is not subject to a requirement to exhaust state administrative remedies where the constitutional challenge is sufficiently substantial to require the convening of a three-judge court.

This principle has been reaffirmed in Houghton v. Shafer, supra, where a dismissal on the grounds of failure to exhaust administrative remedies was overturned. The court in this case understood that it would be compelling an exercise in futility to require petitioner to appeal to the Deputy Commissioner of

Correction if the rules were validly and correctly applied to petitioner and were strictly enforced throughout the correctional system.

The rationale behind this doctrine is the avoidance of decision in those cases where a norm may have been incorrectly applied or construed. Bypassing the administrative proceeding may exclude the possibility of correcting administrative error within the administrative sphere. Good policy directs that Federal Courts should await administrative decision if there is a good chance the norm in question be construed in a way which would render review unnecessary. However, if the only way to overturn the decision of the administrative body would be to declare the norm unconstitutional, to require exhaustion would be to require a futile act.

The import of these cases has not been to do away with the exhaustion doctrine but rather to preclude a wooden application of the doctrine. Eisen v. Eastman, supra, 421 F.2d at page 569; Vistamar, Inc. v. Vazquez, supra, 337 F. Supp. at page 380. Paraphrasing what was expressed in Houghton v. Shafer, supra; if in order to be successful at the administrative level, the agency would have to violate or derogate its regulation, exhaustion would not be required. Similarly, exhaustion of state administrative remedies is not required where the administrative remedy is inadequate, as in *McNeese,* or where it is certainly or probably futile, as in *Damico, Smith* and *Houghton.* Eisen v. Eastman, supra, 421 F.2d at page 569.

It follows that where civil rights are asserted, exhaustion of state administrative remedies will not be required where the complaint alleges facial unconstitutionality. Hobbs v. Thompson, supra. This is particularly so where we are dealing in cases involving primary action protected by the First Amendment. Facial unconstitutionality has an eminently chilling effect on constitutionally protected freedoms of expression and assembly.

It is therefore, clear that where civil rights are asserted, exhaustion of state remedies has not been held to be a prerequisite to the maintenance of a Federal cause of action under Section 1983, Sostre v. McGinnis, supra. A fortiori, where the civil rights complaint is framed in terms of facial unconstitutionality, courts have held exhaustion inapplicable since accelerated relief is the essence of the action. e. g. Moreno v. Henckel, supra; Hobbs v. Thompson, supra, 448 F.2d at page 461.

The Supreme Court has pronounced itself recently twice on the matter of exhaustion requirements in civil rights cases. In the case of Wilwording v. Swenson, supra, it cited Monroe v. Pape, supra; McNeese v. Board of Education, supra, and Damico v. California, supra, to restate its position that the remedy provided by the Civil Rights Act are supplementary to state remedies.

In the case of Carter v. Stanton, supra, the Supreme Court, while entertaining an action where it was contended that an Indiana Welfare regulation governing the eligibility for state and federal aid to dependent children contravened the Fourteenth Amendment and the Social Security Act, vacated a dismissal by a three-judge court of a civil rights action. The three-judge court had dismissed the action on the ground that none of the claimants had exercised their right under the Indiana law to appeal from a county decision denying welfare assistance; therefore, failing to exhaust administrative remedies. The Supreme Court while vacating and remanding the action stated the District Court had jurisdiction pursuant to Title 42, United States Code, Section 1983 and Title 28, United States Code, Section 1343, on the authority of Damico v. California, supra; McNeese v. Board of Education, supra and Monroe v. Pape, supra.

In the present case, petitioners were summarily suspended from the Arecibo Regional College for alleged violations to the General Student Regula-

478

tions. Charges against them were seen by an Administrative Board which made findings of fact and determined students had violated the regulations involved.

After hearing the recommendations given by the Administrative Board, the Dean and Director of Arecibo Regional College decided to suspend students until December, 1972. Petitioners allege that the sections of the student regulations according to which they were suspended are facially unconstitutional and constitute an impairment on their constitutionally protected rights of freedom of expression and assembly. Exhaustion should not bar them from seeking equitable relief in a Federal forum.

## III. ABSTENTION

The abstention doctrine announced in Railroad Commission v. Pullman Company, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), was instituted in order to prevent Federal equitable intervention in those cases where state court construction of its laws could obviate the need for a decision on a Federal claim. This equitable doctrine is premised on the "avoidance of *needless* friction with state policies", (emphasis added), the avoidance of unnecessary decisions of constitutional issues, 312 U.S. at page 500, 61 S.Ct. at page 645.

■ Generally, Federal Courts have applied the abstention doctrine only when the resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1964). That is, federal courts should abstain only in cases where the applicable state law which would be dispositive of a matter in controversy was unclear and where a state court interpretation of the state law question might obviate the necessity of deciding the federal constitutional issue. Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). Where the issue of state law is uncertain and the state may construe it in such a way so as to render it consti-

tutionally sound, then it would be inviting unnecessary friction to have the Federal courts intervene with what can be best dealt with by the state courts, Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970). See also Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).

The United States Court of Appeals for the First Circuit has recently addressed itself to the scope of the abstention doctrine. In Druker v. Sullivan, 458 F.2d 1272 (decision entered on April 4, 1972), the court sustained a district court's decision to abstain pending state court review of the rent board's action with regard to the application of a Boston rent control ordinance. After an analysis of the enabling acts, it was determined that the rent control board could construe them in such a way so that the constitutional issue could be avoided.

■■ In the *Druker* case, however, the court stated that ". . . . the mere mechanical possibility that a state court decision might make adjudication of the federal claim unnecessary does not itself make abstention appropriate." Druker v. Sullivan, supra. There are other factors that must be borne in mind. Excessive delay in the adjudication of Federal rights is a decisive factor working against denying equitable relief because of abstention. Because of the delay caused by applying the abstention doctrine, it is particularly disfavored in First Amendment or civil rights cases. Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377. More specifically, this has been the case where overbreadth or vagueness are at issue. See Dombrowski v. Pfister, 380 U.S. 479, at page 492, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

■ The abstention doctrine has been employed often where a complicated regulatory scheme of local law involves important state public policies. This is clearly not the case here. The General Student Regulations are no complicated regulatory scheme. They are

clearly worded norms dealing with the power of the university to summarily suspend students and restricting student activities so as to avoid undue interruption of university life. The policy behind those regulations is equally clear: to maintain institutional order.

■ The desirability of applying the abstention doctrine also hinges, as is the case with the exhaustion requirement, on the relative adequacy of available state remedies, McNeese v. Board of Education, supra. Consequently, Federal statutes which limit the power of the federal courts to enjoin enforcement of state taxes or utility ratemaking regulations nevertheless allow the courts to act whenever they find that the state fails to offer a "plain, speedy and efficient" remedy. Such a remedy is not available to petitioners.

Article 678 of the Code of Civil Procedure of Puerto Rico, as amended, Title 32, Laws of Puerto Rico Annotated, Section 3524, provides in the pertinent part:

"An injunction or restraining order cannot be granted:" . . .

"3. To restrain the application or enforcement of any statute of the Legislature of Puerto Rico, or the performance by a public officer, a public corporation, or a public agency, or by any employee or officer of such corporation or agency of any act authorized by a law of the Legislature of Puerto Rico, unless it has been determined by final, firm, unappealable, and unreviewable judgment that such statute or act authorized by law is unconstitutional or invalid.

Any injunction, preliminary, permanent, or of the nature of a restraining order, including any order to enforce the jurisdiction of a Court or to secure the enforcement of any judgment, issued under the circumstances set forth in this clause 3 and in force on the date this Act takes effect, or which may hereafter be issued, shall be null and ineffective."

Very recently, the Supreme Court of the Commonwealth of Puerto Rico, in the case of Arrarás v. Tribunal Superior, No. O-70-25 (decision entered on January 27, 1972), held that a petition for an injunction filed by university students in order to enjoin the Dean of the Mayaguez Campus of the University of Puerto Rico and the President of the Disciplinary Board, was improvidently granted by the lower court. The petition for injunction sought to enjoin appellants from instituting disciplinary proceedings against students of the Mayaguez Campus. The Mayaguez Campus is one of the campuses of the University of Puerto Rico. The administration had filed charges against the students for having allegedly violated Section 7 of Article I of the General Student Regulations. The students alleged that said article requiring permit for picketing was violative of their First Amendment rights.

The court did not enter into the merits of the constitutional claim but vacated injunction order granted by the lower court on the grounds that since the actions of the university administrators were authorized by the state university regulations, they fell within the provisions of the anti-injunction statute, Title 32, Laws of Puerto Rico Annotated, Section 3524.

The significance of the state statute is clear. Even more so with respect to students; since it has been construed by the State Supreme Court so as to preclude injunctive relief against public officials unless it is shown that their actions were ultra vires. As long as they abide by the regulations, equity cannot reach them. Hence, students are precluded from alleging facial unconstitutionality of the General Student Regulations while seeking injunctive relief. Only those statutes already determined to be unconstitutional may be challenged in order to obtain injunctive relief.

The delay caused by abstention seems particularly unreasonable in cases where civil rights are violated by statutes at-

tacked as unconstitutionally vague and overbroad restrictions of First Amendment rights. See Dombrowski v. Pfister, supra, 380 U.S. at page 492, 85 S.Ct. 1116. Not only would petitioners be precluded from seeking speedy relief for violations of rights "inherently incapable of pecuniary valuation", Hague v. CIO, 307 U.S. 496, 530, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), and traditionally afforded special treatment by the Court; but they would also be denied access to Federal Courts in order to seek declaratory and injunctive relief from possible applications of statutes vague enough so as to constitute a chilling effect on First Amendment freedoms.

 Some implications may be derived from the vagueness doctrine so as to further justify the unsuitability of abstention in its context. For instance, the doctrines of ripeness or standing may bar an attack on a statute on substantive grounds if the statute has not yet been applied by the state against plaintiffs. See A. Bickel, the Least Dangerous Branch, pp. 149–150 (1962). To that effect, abstention may be used by courts in order to insure that the requisites of standing and ripeness are met. But, it is a fact that a vagueness attack has the secondary effect of relaxing those two requisites and, therefore, undermines the utility of the abstention doctrine.

This is a case where the alleged vagueness of some of the university regulations hinges on the lack of adequate notice to students of what may constitute unprivileged conduct according to statute. This Court could consider abstention if it were readily apparent that the allegedly vague statute could be promptly construed by the State Courts so that they could determine the statute's meaning with sufficient definiteness.

It is very unlikely that this would happen as the Puerto Rico anti-injunction bars injunctive relief in this case. We should not expect the additional recourse to administrative appeals to shed light on the statute since the Supreme Court of the Commonwealth of Puerto Rico has intimated that the actions of the university officials are within the purview of the regulations. If their conduct can be equitably restrained only if it goes beyond the scope of the statute and such conduct has been determined to be ultra vires, nothing will require the administration to reinterpret the statute differently. It is unlikely that a federal court will unnecessarily interfere with state judicial policy, since there is no way petitioners can challenge the statute and seek injunctive relief.

## IV. RIPENESS FOR ADJUDICATION

The basic consideration entertained by this Court in order to deny injunctive and declaratory relief in a case in which students challenged the validity of the student regulations last year, was that their action was not ripe for adjudication. Consejo General de Estudiantes, etc. et al. v. University of Puerto Rico, 325 F.Supp. 453, at page 456 (D.C. 1971). In that case, the charges against petitioners for violations of the Student Regulations were being considered in administrative hearings before the Discipline Committee of the University. We held that the finality requirement was not met by plaintiffs. See Stevenson v. Board of Education of Wheeler County, Georgia, 426 F.2d 1154 (5 Cir. 1970).

 In Stevenson v. Board of Education of Wheeler County, Georgia, supra, the Court of Appeals for the Fifth Circuit, required finality from the complaining student before seeking relief in the federal court. By finality, it is meant, " . . . . That the expulsion decision is not ripe for adjudication absent the denial of relief to the student by the school board or the designee of the school board, for such purposes." Stevenson, supra at page 1157. It has been held that due process requires an administrative hearing prior to expulsion or suspension, Dixon v. Alabama State Board of Education, 294 F. 2d 150 (5 Cir. 1961). Conversely, the student will ordinarily be required to

await the decision of the Discipline Committee. Finality is complied with, according to *Stevenson,* when the decision by the discipline committee is handed down. It does not mean that it must be the final decision of the administrative body.

 Shortly after *Stevenson,* a Texas District Court, in the case of Karr v. Schmidt, 320 F.Supp. 728 (1970), held that failure to exhaust state remedies was no jurisdictional bar to a class action seeking injunctive relief against enforcement of a portion of a dress code relating to the length of hair for boys. The Court cited *Stevenson* in holding that prior reference to the institutional authority is required in order to comply with ripeness and finality requirements. In *Karr,* the action of the principal of Coronado High School was approved by the Board of Trustees after a full hearing. The District Court held this to have clearly fulfilled the finality requirement. The same principle applies in this case. On January 15, 1972, the Disciplinary Council held official administrative hearings with the purpose of ascertaining evidence of the charges made against plaintiffs. On January 18, 1972, the Disciplinary Council submitted a report of its findings of fact and recommendations to the Dean and Director of the Arecibo Regional College. On January ——, 1972, the Dean and Director suspended both students from the Arecibo Regional College until December 31, 1972. This decision taken by the Director and Dean of the Arecibo Regional College renders this case ripe for adjudication.

## V. PREREQUISITES TO SUITS UNDER TITLE 28, UNITED STATES CODE, SECTION 2281

### A. *Substantial Constitutional Claim*

 The initial inquiry the Court has to make before it decides to convene a three-judge court, is whether the complaint complies with the requirements of Section 2281 of Title 28, United States Code. Under the cases, a state statute or regulation must be challenged; a state officer or local officer performing a state function must be a party defendant; injunctive relief must be sought; and it must be alleged that the statute or regulation violates the federal Constitution. See Gilhool v. Chairman, 306 F. Supp. 1202 (D.C.Pa.1969). The complaint herein satisfies these requirements.

 We are obliged to treat the Commonwealth of Puerto Rico's statutes or regulations the same as if Puerto Rico were a state for purposes of Section 2281 jurisdiction. Mora v. Mejias, 115 F.Supp. 610 (D.C.P.R.1953); Wackenhut Corp. v. Aponte, 266 F.Supp. 401 (D.C.P.R.1966).

 The state statute or regulation challenged must be challenged so that a substantial constitutional claim be at issue. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).

 The constitutional question may be unsubstantial either because it obviously has no merit, Ex Parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933) or because prior decisions of the United States Supreme Court have settled the question. Turner v. Memphis, 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962); Bailey v. Patterson, 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). If the question presented has been settled by prior decisions, then a three-judge court should not be required in order to pass on the validity of state statutes so clearly valid or invalid.

In the present case, petitioners challenge the validity of the General Student Regulations of the University of Puerto Rico alleging that various sections [2] of those regulations are facially unconstitutional because of vagueness and overbreadth. This Court, when it decided

2. See footnote number 1.

the case of Consejo General de Estudiantes, etc. et al. v. University of Puerto Rico, supra, stated at page 455, of 325 F.Supp., that:

> "A complete study of the General Student Regulations of the University of Puerto Rico has been made. This study convinces the Court that the General Student Regulations of the University of Puerto Rico are far from unconstitutional 'on their face'; on the contrary, they are a valid exercise of the power of state educational institutions to provide rules of student conduct and disciplinary sanctions for infractions thereof." (cases cited).

> . . . . . .

> "In short, the Regulations attacked in this case are so patently valid that the constitutional claim made by plaintiffs must be considered insubstantial. Therefore, we are under no duty to convene a three judge court to consider a petition for an injunction."

This Court cited a host of cases in which Federal Courts had refused to apply student regulations within the context of university life. See Esteban v. Central Missouri State College, 290 F. Supp. 622 (D.C.Mo.1968) aff'd 415 F.2d 1077 (8 Cir. 1969) (Blackmun, J.) cert. den. 398 U.S. 965, 90 S.Ct. 2169, 26 L. Ed.2d 548 (1970); Siegel v. Regents of University of California, D.C., 308 F. Supp. 832, etc. The rationale behind most of the cases refusing to apply a vagueness test to University regulations was predicated upon several principles. Namely, that because of the particular nature of academic life, universities have an inherent power to discipline students and that this power may be exercised without the necessity of relying on specific rules of conduct.

The Court has reconsidered its position in the light of current decisions on the issue of vagueness or overbreadth of state statutes and its effect on First Amendment rights and also in the light of the facts of this case, and it is of the opinion that the constitutional claim made by the plaintiffs must be considered substantial. The case of Siegel v. Regents of University of California, 308 F.Supp. 832 (D.C.Cal.1970), which we cited in Consejo General de Estudiantes et al. v. University of Puerto Rico, supra, upon which the defendants ardently rely in the case herein is not applicable to the situation herein.

### B. Statewide Applicability

■ In the recent case of Board of Regents of University of Texas System v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (decision entered on January 24, 1972), the Supreme Court of the United States held that a three judge court had been improperly convened to determine the constitutionality of the general student regulations of the University of Texas. The Court decided that rules promulgated by the University of Texas Board of Regents restricting commercial and non-commercial solicitation on the university compuses are of local import only, and that three-judge court was improperly convened to determine their constitutionality.

In the Texas case, the Court noted that the rules promulgated by the Board of Regents extends to but three of the twenty three four-year state colleges and universities of Texas. In addition, Texas has 31 junior colleges which are not within the University of Texas system. In view of this finding, the Court followed the ruling in Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967), that a single judge, not a three-judge court, must hear the case where the challenged statute or regulation is of only local import.

The Court observed its oft repeated admonition that the three-judge court statute, Title 28, United States Code, Section 2281, is to be strictly construed. The rule announced in Moody v. Flowers, supra, achieves the Congressional purpose of minimizing the burden which the three-judge court places on the Fed-

eral judiciary and avoids unduly expanding the court's carefully limited appellate jurisdiction.

We hold the regulatory scheme of the University of Puerto Rico is of unquestionable statewide applicability and that, therefore, a three-judge court is required to pass on its constitutional validity.

The University of Puerto Rico is the educational institution that has the greater impact in the economic and intellectual life of Puerto Rico. In Fiscal year 1968, the University of Puerto Rico's enrollment had reached 31,115 in all the campuses, including the regional colleges. It was estimated then that enrollment would increase to 41,855 by 1972, and 50,000 by 1975. See The Four Year Economic and Social Development Plan of Puerto .Rico, 1969–1972; pp. 94–111. The major increase has been in the enrollment of the newer regional educational institutions. During the past four years total expenditures have roughly reached the amount of $200.4 million. See Plan at p. 109.

In January 20, 1966, a university reform bill was approved by the Puerto Rico Legislature. The purpose of the bill was to reorganize the University of Puerto Rico. In Article 3, the University law provides that the University of Puerto Rico will have a governing board to be named Council of Higher Education. This Board will be composed of the Secretary of Education and eight additional persons appointed by the Governor, Article 3B(1). One of the duties and powers of the Council will be to approve the General Student Regulations and the Student Regulations for each and every campus, Article 3E(5). The Council of Higher Education will also promulgate norms for the accreditation of institutions of higher learning of Puerto Rico, Article 3G(2).

The University of Puerto Rico has Regional Colleges in the towns of Cayey, Arecibo, Bayamón, Humacao. It plans to open additional regional colleges in accordance with the decentralization policy followed by the government. The campus in Río Piedras is the single largest campus on the Island. It has the only Graduate School of Pedagogy in Puerto Rico. It also offers post-graduate degrees in the Humanities, Social Sciences, Business Administration and the Natural Sciences. It houses the only accredited School of Architecture and the largest School of Law on the Island.

The only medical school in Puerto Rico is also administered by the University of Puerto Rico which also runs the Agriculture and Engineering College in Mayaguez. Since the University of Puerto Rico is then the only local provider of training for such vital professions, the Puerto Rico Government keeps close guidance and contact with the institution. The Council of Higher Education, through the University of Puerto Rico, has the burden of chartering and implementing the policies for higher education.

The General Student Regulations are not a municipal ordinance. They are not a statute of purely local impact. They affect students from all the main areas of the Island where the University has established satellite regional colleges. Those regulations are the expression of the educational policy of Puerto Rico with regard to its state operated universities. They were approved by the Council of Higher Education and are applied by all the colleges ascribed to the University of Puerto Rico.

The far-reaching applicability of these student regulations coupled with the importance of the educational policies they profess to subscribe are important factors considered by this Court in determining that they have the status spoken of in 28 United States Code 2284.

In view of the foregoing Memorandum Opinion, the Motion to Dismiss filed by the defendants, will be dismissed and a three-judge court will be convened. An order will be entered accordingly.