William S. RICHARDSON, Henry H. Peters, Oswald K. Stender, Myron B. Thompson, and Matsuo Takabuki, in their capacities as Trustees of the Kamehameha Schools/Bernice Pauahi Bishop Estate, Plaintiffs,

v.

CITY AND COUNTY OF HONOLULU, a Hawaii municipal corporation, Defendant.

Civ. No. 90–00856 DAE.

United States District Court, D. Hawaii.

March 13, 1991.

C. Michael Hare, Gail M.M. Tamashiro, Ernest H. Nomura, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, for plaintiffs.

James K. Mee, Ashford & Wriston, Honolulu, Hawaii, for intervening plaintiff.

Ronald B. Mun, Donna M. Woo, Deputy Corp. Counsel, City and County of Honolulu, Honolulu, Hawaii, for City and County of Honolulu.

ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S COUNTER–MOTION TO DISMISS OR ABSTAIN OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, OR, IN THE FURTHER ALTERNATIVE, FOR RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 56(f)

DAVID A. EZRA, District Judge.

Plaintiffs William S. Richardson, Henry H. Peters, Oswald K. Stender, Myron B.

Thompson, and Matsuo Takabuki ("plaintiffs") bring this motion for partial summary judgment[1] pursuant to Federal Rule of Civil Procedure 56. The defendant City and County of Honolulu ("City") brings a counter-motion to dismiss or abstain or, in the alternative, for summary judgment, or in the further alternative, for relief under Rule 56(f). Both motions came on for hearing before this court on March 4, 1991.

C. Michael Hare, Esq. and Gail M. Tamashiro, Esq. appeared on behalf of the plaintiffs; Donna M. Woo, Esq. appeared on behalf of the City; and James K. Mee, Esq. appeared on behalf of intervenors Small Landowners of Oahu ("SLO").[2] The court, having heard oral arguments and having read the memoranda submitted in support of and in opposition to both parties' motions, and being fully apprised as to the premises therein, grants plaintiffs' motion for partial summary judgment and denies the City's motion to dismiss or abstain or, in the alternative, for summary judgment or, in the further alternative, for Rule 56(f) relief.

Careful review and analysis of constitutional law and precedent convinces this court that a properly crafted ordinance, the purpose of which is to limit lease rent increases, can pass constitutional muster. Ordinance 90–95, however, fails to meet constitutional requirements in several important respects, amounts to a taking of property without just compensation, and is therefore unconstitutional on its face.

## BACKGROUND

On November 15, 1990, the Honolulu City Council passed Bill 81 (1990) ("Bill"), which was entitled, "A Bill for an Ordinance Relating to the Renegotiation of Residential Lease Rents for Real Property Situated in the City and County of Honolulu." The Bill was presented to Mayor Frank F. Fasi, who returned it to the City Council unsigned.[3] On November 23, 1990, Bill 81 (1990) became effective as Ordinance 90–95 ("Ordinance") without the mayor's signature.

The Ordinance purports to impose a maximum ceiling on renegotiated lease rents for *residential condominiums only* in the City and County of Honolulu.[4] Specifically, the Ordinance provides that the "renegotiated annual ground rent" shall not exceed the initial lease rent paid at the beginning of the lease multiplied by a "rent factor." The "rent factor" is determined by averaging an "inflation factor" and an "income factor."[5]

The "inflation factor" is defined as the value of the Consumer Price Index ("CPI") for Honolulu on the renegotiation date divided by the value of the CPI on the effective date of the lease. The Ordinance does not define which of several CPI's is to be used in the calculations.[6] The "income factor" is defined as the value of the Disposable Income per Capita ("DIC") for Hawaii on the renegotiation date divided by the value of the DIC on the effective date of the lease.

---

1. Plaintiffs move for summary judgment with respect to Counts I, II, III, IV, VII, and IX of the complaint. They have not moved for summary judgment with respect to Count V (procedural due process), VI (equal protection), or VIII (claims under Hawaii state constitution).

2. Although SLO did not file a memorandum in support of plaintiffs' motion, Mr. Mee indicated at the hearing on this motion that SLO joins in plaintiffs' arguments in every respect.

3. In a letter to Arnold Morgado, Jr., Chair of the City Council, Mayor Fasi stated in part:
 My support of the concept of this measure makes me reluctant to veto it, but my doubts about its legality preclude me from signing it. My recourse is to allow it to become law without my approval.

Letter From Mayor Fasi to Arnold Morgado and Councilmembers dated November 23, 1990.

4. "This article shall apply to all leases in the City and County of Honolulu *for land appurtenant to residential condominium structures of any kind,* or for land together with a condominium unit in said structure, *including mixed-use buildings in which more than 50 percent of the floor space under cover is used for residential purposes.*" Ordinance 90–95. *See infra* note 33 and accompanying text.

5. Provided that if the "rent factor" exceeds the "income factor," then the "income factor" shall be the "rent factor."

6. *See infra* note 24.

The average of the "inflation factor" and the "income factor" equals the "rent factor." In order to determine the maximum amount of rent that may be charged upon renegotiation, the rent paid by the lessee at the commencement of the lease is multiplied by the "rent factor." The lessors are bound by this formula whether or not the initial rent paid by the lessee reflected the market value of the property at the time the lease was entered into.[7]

The maximum renegotiated rents mandated by the Ordinance apply for the full renegotiated rent period and are not readjusted to reflect changes in the CPI or DIC which might occur during that time. The Ordinance does not take into consideration the location or any other unique or particular characteristics of the property. There is no administrative procedure for appeal, and no governmental body has been established or designated in the Ordinance for the purpose of interpreting and applying the Ordinance's provisions.

Plaintiffs claim that the Ordinance is facially unconstitutional. In bringing the present motion, plaintiffs have asked the court to consider (1) whether the Ordinance constitutes a taking without just compensation; (2) whether the Ordinance violates plaintiffs' substantive due process rights; (3) whether the Ordinance violates the Contracts Clause; (4) whether the Ordinance is unconstitutionally vague and ambiguous; (5) whether the City infringed upon plaintiffs' civil rights in violation of 42 U.S.C. § 1983; and (6) whether the Ordinance is preempted by state law.

## DISCUSSION

### A. City's Motion to Dismiss

■ A complaint should not be dismissed " 'unless it appears beyond doubt that [the] plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Baker v. McNeil Island Corrections Center*, 859 F.2d 124, 127 (9th Cir. 1988), *quoting Conley v. Gibson*, 355 U.S.

41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). All allegations of material fact are to be taken as true and construed in a light most favorable to the non-moving party. *Id., citing Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428, 1430 (9th Cir.1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 773 (1986).

The City contends that this court lacks subject matter jurisdiction over plaintiffs' facial takings clause challenge of Ordinance 90–95 because the claim is unripe. In support of its argument, the City cites *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985).

In *Williamson*, the United States Supreme Court held that an as-applied takings claim was not ripe for adjudication because the Williamson County Regional Planning Commission had not yet issued a final decision regarding the application of a zoning ordinance to the developer's property, nor had the developer utilized procedures available under Tennessee law to seek just compensation. 473 U.S. at 186, 105 S.Ct. at 3116. The court held that the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations "simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." [8] *Id.* at 191, 105 S.Ct. at 3119.

In two cases originating in this court, *as-applied* takings claims were dismissed as unripe pursuant to *Williamson*. In *Austin v. City and County of Honolulu*, the appellant challenged a zoning ordinance on the ground that it failed to provide just compensation. 840 F.2d 678 (9th Cir.1988). The district court found a taking which required just compensation. The Ninth Circuit reversed the district court's finding on the ground that the claim was unripe

---

7. All parties concede that initial rents charged by lessors are often below market value because other factors have been taken into consideration, such as construction debts or other financing obligations borne by the lessee.

8. As discussed more fully below, Ordinance 90–95 makes no provision for any administrative agency or other governmental body to promulgate regulations or issue variances to tailor lease rent caps to lessors' individual circumstances.

because the appellant had failed to seek compensation through adequate state remedies.

For one, the appellant in *Austin* had failed to seek a variance from the City Planning Department. 840 F.2d at 680. In addition, the Ninth Circuit held that the appellant had a cause of action under the Hawaii constitution, art. I, § 20, for just compensation,[9] and that this remedy should be pursued in state court *before* bringing an action in federal court. *Id.* at 681.

> Until the state courts establish that landowners may not obtain just compensation through an inverse condemnation action under any circumstances, Hawaii procedures are adequate within the terms of *Williamson County* and Austin's failure to use them cannot be excused.

*Id.* Because the appellant had not brought an action in state court asserting his right to just compensation under the Hawaii constitution, his federal claims were not ripe. *Id.*

Similarly, in *Lai v. City and County of Honolulu*, the Ninth Circuit reversed a district court finding that a zoning ordinance resulted in a compensable taking on the ground that the developer's claim was not ripe for review in federal court. 841 F.2d 301 (9th Cir.1988). First, the Ninth Circuit noted that the developer had failed to seek a variance from the City. Second, the court held that the developer had an obligation to " 'seek compensation through the procedures the State has provided for doing so.' " *Id.* at 303, *quoting Williamson*, 473 U.S. at 194, 105 S.Ct. at 3121.

> [A] plaintiff's claim is not ripe until "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."

*Id., quoting Williamson*, 473 U.S. at 186–88, 105 S.Ct. at 3117.

■ A recent Ninth Circuit opinion applied the *Williamson* ripeness requirements to a *facial* takings claim. In *Southern Pacific Transp. Co. v. City of Los Angeles*, the court held that a facial chal-

lenge, alleging that the mere enactment of a statute effects an unconstitutional taking, is unripe unless and until it is known what, if any, compensation is available. 922 F.2d 498, 505–06 (9th Cir.1990). "Even facial challenges must overcome the just compensation ripeness hurdle." *Id.* at 506.

> In short, in the absence of knowledge regarding the availability of compensation, appellants' challenges to the constitutionality of the ordinance are simply unripe—whether they be dressed in their "as-applied" or "facial" garb.

*Id.* at 507.

The court in *Southern Pacific* noted that its holding did not apply to *all* facial challenges.

> This is not to say that all facial challenges to zoning restrictions will be subject to this hurdle. In some instances, as we have seen, it will not be an issue because the court is simply considering whether a taking has occurred, not whether it is a taking "without just compensation." In others, no compensation would be sufficient to cure the constitutional infirmity. Some harms are "impermissible even if the government is willing to pay for them."

922 F.2d at 506 n. 11 (citation omitted). This court interprets *Southern Pacific* to stand for the proposition that where the amount of compensation is not at issue, it is not necessary for the party bringing a facial challenge to first seek review in state court. In other words, a facial challenge is not unripe if the amount of compensation afforded under the ordinance is not unclear.

This interpretation is the only one which would square with cases decided by the United States Supreme Court both before and after *Williamson*. Even in *Southern Pacific*, the court acknowledged that "the Supreme Court often has reached the merits of facial attacks without regard for ripeness considerations." 922 F.2d at 505, *citing Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987), *Loretto v. Tele-*

---

9. Article I, § 20, of the Hawaii constitution provides: "Private property shall not be taken or damaged for public use without just compensation."

*prompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), *and Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

Plaintiffs accurately and candidly note that "[t]he Supreme Court has not directly addressed the issue of whether a taking claim pursued through a facial challenge of a regulation is premature unless the plaintiff has first pursued state compensation." Plaintiffs' Memorandum in Opposition to Defendant's Counter–Motion to Dismiss or Abstain or, in the Alternative, for Summary Judgment or, in the Further Alternative, for Relief Under Fed.R.Civ.P. 56(f) ("Plaintiffs' Memorandum in Opposition to Defendant's Counter–Motion") at 15. In *Keystone Bituminous Coal Ass'n v. DeBenedictis*, a case decided after *Williamson*, the Supreme Court distinguished between facial and as-applied takings claims,[10] but did not specifically address the ripeness doctrine in general or, specifically, whether *Williamson* applied to facial challenges. 480 U.S. at 494, 107 S.Ct. at 1247. The court did, however, address the merits of respondent's facial claim apparently without considering ripeness an issue. Similarly, in *Loretto, Hodel,* and *Agins,* the court addressed the merits of the appellants' facial takings claims without considering ripeness as a potential obstacle. *See* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

In *Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, the Ninth Circuit held that an as-applied takings claim was unripe; *at the same time,* however, the court addressed the merits of the facial attack as ripe. 841 F.2d 872 (9th Cir.1987). This case suggests that a different ripeness standard applies to facial challenges than to as-applied claims. In a similar vein,

this court in *Kaiser Development Co. v. City and County of Honolulu* characterized the *Williamson* holding as applying only to as-applied takings claims.[11] 649 F.Supp. 926 (D.Haw.1986).

There is no clear precedent stating whether or not a facial takings claim is subject to the same ripeness hurdles as an as-applied claim. Precedent suggests, however, that the same ripeness demands are *not* made of facial attacks as they are of as-applied claims for just compensation. Logic dictates this result: if a plaintiff is claiming that he has not been justly compensated, it is necessary for the court to know precisely what amount of compensation the state was willing to offer. In bringing a facial challenge, however, the plaintiff does not seek compensation for a particular piece of property but rather seeks a declaration that the "mere enactment" of an ordinance constitutes a taking.

Except for the Ninth Circuit's opinion in *Southern Pacific*, this court has found no cases applying the *Williamson* ripeness requirements to a facial takings claim. In fact, Supreme Court precedent both before and after *Williamson* implies that ripeness is not a significant issue when it comes to facial challenges. Furthermore, even in *Southern Pacific*, the Ninth Circuit did *not* hold that *Williamson* applied to *all* facial challenges; rather, the court held that the facial claim was unripe because the state had not ruled on whether or to what extent compensation would be available.

It is this court's opinion that *Southern Pacific* must be read narrowly. The court in *Williamson* applied the ripeness requirements only to an *as-applied* claim and did not state that its holding applied to *facial* challenges as well. If the Supreme Court had intended to subject all facial challenges to the ripeness requirements set forth in *Williamson*, then it would most likely have applied those requirements to the facial

10. "The posture of the case is critical because we have recognized an important distinction between a claim that the mere enactment of a statute constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment

of just compensation." *DeBenedictis*, 480 U.S. at 494, 107 S.Ct. at 1247.

11. "*Williamson County* focused on whether zoning regulations *as applied* to a particular parcel constituted a taking...." 649 F.Supp. at 943 n. 24.

challenge brought in *Keystone*. Moreover, the Ninth Circuit's opinion in *Lake Nacimiento* has not been reversed by either the Ninth Circuit or the United States Supreme Court,[12] and the Ninth Circuit in that case clearly and unequivocally applied the *Williamson* ripeness doctrine to an as-applied claim but not to a facial challenge.

Furthermore, the present case is distinguishable from the scenario in *Southern Pacific* because the amount of compensation available under the Ordinance is not entirely unclear. The City has already set forth a formula for determining the amount of rent allowable under Ordinance 90–95. In addition, as discussed more fully below, the Ordinance's constitutional infirmity is so substantial that even applying the reasoning of *Southern Pacific*, the facial challenge is ripe. Thus, if *Williamson* applies to facial challenges at all, it would not apply to the present case.

Based on the foregoing discussion, this court finds that the ripeness requirements outlined in *Williamson* and upheld in *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), do not apply to the facial takings claim brought by plaintiffs in the present case.[13] Either (1) the Supreme Court intended to restrict *Williamson* to as-applied claims, as noted by this court in *Kaiser Development Co.* and as practiced by the Ninth Circuit in *Lake Nacimiento;* or (2) even if *Williamson* may apply to facial challenges, it applies only when the regulating governmental entity has made no indication as to the amount of compensation available and it is therefore neces-

sary to wait for such a determination before adjudging whether mere enactment of the statute or ordinance effects a taking. Accordingly, the City's counter-motion to dismiss is DENIED.[14]

**B. City's Motion to Abstain**

The City argues that this court should abstain from hearing plaintiffs' claims. The City requests this court to refrain from ruling on the merits under either the abstention doctrine set forth in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), or that articulated in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■ In general, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813–14, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

> The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an *extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.*

*County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959) (emphasis added). The abstention doctrine is not "an automatic rule applied whenever a federal court is faced with a doubtful issue of state law." *Baggett v. Bullitt*, 377 U.S. 360,

---

**12.** Certiorari was denied at 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988).

**13.** The City argues in its reply memorandum in support of its counter-motion that plaintiffs' takings claim is not facial but as-applied. This argument is clearly without merit. Plaintiffs have never characterized their claim as anything but a facial attack, and the City itself concedes that plaintiffs' claim is a "first-ever, pre-enforcement, *facial* challenge to the regulation of lease rents in [Hawaii]...." Reply Memorandum in Support of Defendant's Counter Motion to Dismiss or Abstain, or, in the Alternative, for Summary Judgment, or, in the Further Alternative, for Relief Pursuant to Rule 56(f) ("Defendant's Reply Memorandum") at 1 (emphasis added).

**14.** The City also contends that plaintiffs do not have standing because they have "failed to sue the proper parties." Defendant's Reply Memorandum at 2. The gist of the City's argument is that plaintiffs should sue the lessees when they try to enforce the Ordinance, instead of suing the City now for its promulgation. The City asserts that "[n]o judgment against the City will prevent Ordinance 90–95 being raised in an eviction action by plaintiffs' lessees, as the lessees have not been sued." *Id.* at 4. This argument is wholly without merit. If plaintiffs' facial challenge is sustained, then there will be no enforceable Ordinance 90–95 for the lessees to invoke.

375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). Rather, the decision whether or not to abstain lies within the sound discretion of the trial court. *Pue v. Sillas,* 632 F.2d 74, 78 (9th Cir.1980).

In *Burford,* the Supreme Court held that the district court should have abstained from presiding over a suit seeking review of the reasonableness under Texas state law of a state commission's permit to drill oil wells. 319 U.S. at 334, 63 S.Ct. at 1107. The court determined that abstention was proper because the state had a complex regulatory scheme governing oil and gas fields, and federal court intervention would interfere with the " 'rightful independence of [the state government] in carrying out [its] domestic policy.' " *Id.* at 318, 63 S.Ct. at 1099, *quoting Commonwealth of Pennsylvania v. Williams,* 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841 (1935).

The *Burford* court recognized, however, that abstention in any case is within the "sound discretion" of the federal court. 319 U.S. at 317, 63 S.Ct. at 1099.

> While *Burford* is concerned with protecting complex administrative processes from undue federal interference, *it does not require abstention whenever there exists such a process, or even in all cases where there is a "potential for conflict" with state regulatory law or policy.*

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 2514, 105 L.Ed.2d 298 (1989) (emphasis added).

In *Pullman,* the Supreme Court reversed a district court order enjoining the Texas Railroad Commission from enforcing a regulation requiring sleeper cars to be patrolled by white conductors only. 312 U.S. at 501–02, 61 S.Ct. at 646. The court held that the district court should have abstained in order to allow Texas state courts to delineate the power and authority of the Commission to promulgate such a regulation. *Id.* at 499–500, 61 S.Ct. at 644–45.

Abstention under *Pullman* is warranted only if "a federal court cannot predict with any confidence how the state's highest court would decide an issue of state law." *Pearl Inv. Co. v. City and County of San Francisco,* 774 F.2d 1460, 1465 (9th Cir. 1985). In the Ninth Circuit, three factors have been identified which must be present in order to justify *Pullman* abstention:

> (1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."
>
> (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
>
> (3) The possibly determinative issue of state law is doubtful.

*Canton v. Spokane School District # 81,* 498 F.2d 840, 845 (9th Cir.1974), *quoting Pullman,* 312 U.S. at 498–99, 61 S.Ct. at 644. The *Canton* court also stated that "cases involving vital questions of civil rights are the least likely candidates for abstention." *Id.* at 846, *quoting Wright v. McMann,* 387 F.2d 519, 525 (2d Cir.1967).

▆ Plaintiffs contend that Ordinance 90–95 is preempted by state law, and the City argues that this court should abstain from hearing plaintiffs' federal law claims because resolution of the state preemption issue could render those claims moot. In several cases, however, district courts have addressed the merits of federal constitutional claims in spite of the presence of state preemption issues.[15]

In the present case, this court finds that the "exceptional circumstances" necessary

15. *See, e.g., Azul Pacifico, Inc. v. City of Los Angeles,* 740 F.Supp. 772 (C.D.Cal.1990) (district court acknowledged that municipal ordinances which conflict with state statutes are invalid but went on to address plaintiff's takings claim nonetheless); *Cammack v. Waihee,* 673 F.Supp. 1524, 1529 (D.Haw.1987) (federal court not required to abstain in order to allow state courts to resolve issue of whether state statute was preempted by collective bargaining agreements); *Hassan v. Town of East Hampton,* 500 F.Supp. 1034 (E.D.N.Y.1980) (district court addressed state preemption issue itself, determining that state law did not preempt town ordinance); *Hoetzer v. County of Erie,* 497 F.Supp. 1207 (W.D.N.Y.1980) (until state court authoritatively resolve preemption issue, plaintiffs are subject to local law and the district court need not abstain from addressing the constitutionality of a county ordinance).

to justify abstention are not present. *See Colorado River*, 424 U.S. at 813, 96 S.Ct. at 1244. "[A] federal court need not abstain merely because there exists the abstract possibility that state courts might render adjudication of the federal question unnecessary." *McMillan v. Goleta Water District*, 792 F.2d 1453, 1457 (9th Cir.1986).

Although a state court might determine that Ordinance 90–95 is preempted by state law, a federal court is not automatically prevented from deciding a federal claim merely because state preemption issues exist.[16] Furthermore, where the possibility of delay exists, it is within the court's discretion to refuse to abstain.

> The high costs attendant upon abstention in terms of delay and frustration of federal claims are matters of equity as well, and are appropriately weighed in the equitable balance.

*Druker v. Sullivan*, 458 F.2d 1272 (1st Cir.1972).[17] Because of the "delays inherent in invoking the [abstention] doctrine and the danger that valuable federal rights might be lost if such rights are not adjudicated expeditiously in federal court," abstention should be invoked "only in special circumstances and upon careful consideration of the facts." *Hoetzer*, 497 F.Supp. at 1211.

In light of the potential for delay of the resolution of plaintiffs' federal claims and for the reasons stated above, this court finds that abstention is not warranted in the present case under either of the doctrines cited by the City. Accordingly, the City's motion to abstain is DENIED.

## C. City's Rule 56(f) Motion to Continue

Rule 56(f) provides that the court may order a continuance of the hearing on a motion for summary judgment "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition...." The City requests a continuance of the present motion because it involves "complicated issues." Memorandum in Support of Defendant's Counter–Motion to Dismiss or Abstain or, in the Alternative, for Summary Judgment or, in the Further Alternative, for Relief Under FRCP Rule 56(f) ("Defendant's Memorandum") at 11. However, the fact that a case involves "complicated" issues of *law* is not a reason for a continuance. Rather, the standard is whether it appears from the City's affidavit that it needs further time to uncover relevant *facts* to support an argument that there are genuine issues of material fact.

The City claims that it "has much discovery to do as to the economic viability of [plaintiffs'] leases under the ordinance." Defendant's Memorandum at 12. The City has had exactly three months in which to conduct discovery, however,[18] and the City acknowledges it has not yet made *any* discovery requests. *See* Plaintiffs' Memorandum in Opposition to Defendant's Counter–Motion at 47. The court also notes that this hearing has already been continued once, at the City's request.[19]

In order to justify a continuance of a hearing on a motion for summary judgment, the non-movants must demonstrate that they have pursued discovery diligently. *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439 (9th Cir.1986); *see also United States ex rel. Army Athletic Ass'n v. Reliance Ins. Co.*, 799 F.2d 1382 (9th Cir.1986). In the absence of any

---

**16.** *See* note 15, *supra*, and accompanying text.

**17.** In *Druker*, the district court abstained from addressing appellants' claim that a Boston municipal ordinance violated the Supremacy Clause of the United States Constitution to the extent that it applied to a housing project subsidized by the federal government. The First Circuit upheld the district court's decision to abstain in order to give the state an opportunity to determine whether the ordinance was valid under the state's enabling act.

Druker's federal claims were not reviewed in federal court until six years after he filed his initial complaint in district court. On appeal, the First Circuit noted that "[t]he history and longevity of this litigation are already formidable.... We are not in a position to say why this fruit took so long to ripen." *Kargman v. Sullivan*, 552 F.2d 2, 3 (1st Cir.1977).

**18.** Plaintiffs filed the present action on December 4, 1990.

**19.** This motion was originally scheduled to be heard on February 19, 1991.

**1486**

outstanding discovery requests or a motion to compel discovery, it is not an abuse of discretion for the trial court to refuse to grant a Rule 56(f) continuance. *Foster v. Arcata Assoc., Inc.,* 772 F.2d 1453 (9th Cir.1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *Gould v. Mutual Life Ins. Co.,* 735 F.2d 1165 (9th Cir.1984).

■ It is within the trial court's discretion to grant or refuse a Rule 56(f) motion for a continuance. *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 769 F.2d 561 (9th Cir.1985). If the non-movants have had ample time to conduct discovery, a continuance is not appropriate. *United States v. Wilson,* 881 F.2d 596 (9th Cir.1989). Where the defendants have had several weeks in which to rebut the plaintiff's argument, defendants are not entitled to a continuance. *Baron v. Bryant,* 556 F.Supp. 531 (D.Haw.1983).

■ As noted above, the City has had three months in which to conduct discovery with respect to the economic viability of plaintiffs' leases under the Ordinance. As such, a ruling on the merits of plaintiffs' claims at the present time would not constitute a "rush to judgment." *Bryant v. Ford Motor Co.,* 886 F.2d 1526, 1533 (9th Cir.1989) (entry of judgment less than five months after removal was proper, in spite of plaintiff's request for a continuance); *Hall v. Hawaii,* 791 F.2d 759, 760–61 (9th Cir.1986) (affirming summary judgment entered four months after filing of suit).

Based on the foregoing, the court finds that the City has not met its burden of persuading the court that a continuance is warranted. *See Taylor v. Sentry Life Ins. Co.,* 729 F.2d 652 (9th Cir.1984). The court notes that the City has filed a substantial memorandum in opposition to plaintiffs' motion. Accordingly, the City's motion for a continuance pursuant to Rule 56(f) is DENIED.

**D. Plaintiffs' Motion for Partial Summary Judgment and City's Counter–Motion for Summary Judgment**

*1. Standard for Summary Judgment*

Rule 56(c) provides that summary judgment shall be entered when:

... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

The burden of showing the absence of any genuine issue of material fact rests upon the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The moving party has the initial burden of "identifying for the court those portions of the materials on file in the case that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ To satisfy its burden, the moving party must make a clear demonstration of the absence of any genuine issue as to the existence of each material fact which, under applicable principles of substantive law, would be required to support a judgment in its favor. *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir.1983). In determining whether a genuine issue of material fact exists, the court should draw inferences from the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Perez v. Curcio,* 841 F.2d 255, 258 (9th Cir.1988).

■ If the moving party meets its burden, the non-moving party must produce significant probative evidence tending to support its legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). In order to defeat a motion for summary judgment, an adverse party "may not rest upon the mere allegations or denials of the adverse party's pleadings." Rule 56(e). Instead, the adverse party must "set forth specific facts showing that there is a genuine issue for trial." *Id.*

## 2. The Takings Clause

### a. In General

The fifth amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." This prohibition against takings without just compensation applies to the states through the fourteenth amendment. *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Chicago, B. & Q.R. Co. v. City of Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *MacLeod v. Santa Clara County,* 749 F.2d 541 (9th Cir.1984), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2705, 86 L.Ed.2d 721 (1985).

 The power to condemn may be delegated by the state. *Jacobson v. Tahoe Regional Planning Agency,* 566 F.2d 1353 (9th Cir.1977), *cert. granted,* 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1978), *aff'd in part and rev'd in part on other grounds,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). When the power to condemn has been delegated to a municipality, the municipality acts under color of state law, and therefore the prohibitions of the fifth and fourteenth amendments apply. *O'Grady v. City of Montpelier,* 573 F.2d 747, 749 (2nd Cir.1978); *Kohlasch v. New York State Thruway Auth.,* 482 F.Supp. 721, 723 (S.D.N.Y.1980).[20]

The fifth amendment's just compensation provision is designed to bar the government from foisting a disproportionate burden upon a particular group of individuals for a harm which is public and whose burden should be shared by the public as a whole. *Pennell v. City of San Jose,* 485 U.S. 1, 9, 108 S.Ct. 849, 856, 99 L.Ed.2d 1 (1988); *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318–19, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987); *Langenegger v. United States,* 756 F.2d 1565, 1570 (Fed.Cir.1985), *cert. denied,* 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985). Although it is generally accepted that governmental regulation may adjust the rights of private parties for the public good, the guaranteed right against uncompensated takings is violated if such adjustment of private rights becomes so disproportionate that the government action is "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960).

 The due process and takings clauses of the United States Constitution "protect 'property' rights created by an independent body of law, usually state law." *Cherry v. Steiner,* 716 F.2d 687, 691 (9th Cir.1983), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 190 (1984); *see also Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984). A state cannot validly effect a taking of property by the simple expedient of holding that the property right never existed. *Cherry,* 716 F.2d at 692. The government does not have unlimited power to redefine property rights without running afoul of the taking clause. *Loretto,* 458 U.S. 419, 439, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982).

In order to evaluate whether Ordinance 90–95, on its face, violates the takings clause, the court must first determine whether the mere enactment of the Ordinance constitutes a taking. *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141. The Ordinance effectuates a taking if it does not allow lessors a fair rate of return on their property. If the court finds that a taking exists, then the Ordinance must further a legitimate public purpose. In addition, the means chosen by the drafters of the Ordinance to further that purpose must be rational. Finally, if the purpose is legitimate and the means are rational, lessors must be provided just compensation for the taking of their property.

Applying the analysis outlined above, the court finds that the mere enactment of Ordinance 90–95 effectuates a regulatory

---

20. In the present case, the City contends that its power to enact Ordinance 90–95 was delegated to it by Hawaii Revised Statutes § 46–1.5(20), which provides: "Each county shall have the power to regulate the renting, subletting, and rental conditions of property for places of abode by ordinance."

taking because it does not allow lessors a reasonable rate of return. The court also finds that although the Ordinance was enacted to further a legitimate public purpose, the means chosen by the drafters of the Ordinance do not rationally further that purpose.[21] This court does *not* hold that *every* effort to regulate rent renegotiations would be unconstitutional. Rather, the court finds that *this particular ordinance* is unconstitutionally overbroad.

b. What Constitutes a Taking

■ A taking does not require an actual physical occupation of property or formal condemnation proceedings. *Hamilton Bank v. Williamson County Regional Planning Comm'n*, 729 F.2d 402, 405 (6th Cir.1984), *cert. granted*, 469 U.S. 815, 105 S.Ct. 80, 83 L.Ed.2d 28 (1984), *rev'd on other grounds*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). It is not essential for the government to have taken property for its own use for a taking to be found. *Langenegger*, 756 F.2d at 1570. A taking can occur without the filing of condemnation proceedings whenever government action beneficial to the public results in the destruction or restriction of the use and general enjoyment of privately owned real property. *MacLeod*, 749 F.2d at 544.

Among the factors to be taken into consideration when determining whether a governmental action has gone beyond "regulation" and constitutes a "taking" are the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations. *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. at 2874; *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), *reh'g denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). The economic impact of governmental regulation, especially the degree of interference with investment-backed expec-

tations, is of particular significance in determining whether government regulation constitutes a "taking." *Loretto*, 458 U.S. at 426, 102 S.Ct. at 3171.

■ A state, in exercising its police power, may adopt reasonable restrictions on private property as long as those restrictions do not amount to a taking without just compensation. *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980). Government regulation can be so onerous as to constitute a taking which constitutionally requires compensation. *American Sav. & Loan Ass'n v. Marin County*, 653 F.2d 364, 368 (9th Cir.1981), *citing Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); *see also Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327 (9th Cir.1977). Although the deprivation of a right to use and obtain a profit from property is not in every case independently sufficient to establish a taking, it is extremely relevant. *Loretto*, 458 U.S. at 436, 102 S.Ct. at 3176.

■ Whether an unconstitutional taking of property has occurred depends upon whether the owner has been deprived of an economically viable use of the property. *Citizen's Ass'n v. Int'l Raceways, Inc.*, 833 F.2d 760, 762 (9th Cir.1987). In order to determine whether the regulation denies the owner an economically viable use of his property, individual inquiries must be conducted by the court with respect to the specific property, and particular estimates must be made of the economic impact in each case. *Hodel*, 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981).[22]

■ Lessors under rent controlled leases must be guaranteed a fair return on

---

**21.** Similarly, in *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 130 Cal.Rptr. 465, 550 P.2d 1001 (1976), the California Supreme Court held that although the legislative purpose behind an initiative amendment to Berkeley's Charter was legitimate, the means chosen by the legislature to accomplish that purpose were not rational. "[W]e also hold … that the Berkeley Charter amendment transgresses the constitutional limits of the police power not because of its objec-

tives but because *certain procedures it provides would impose heavy burdens upon landlords not reasonably related to the accomplishment of those objectives.*" *Id.* at 136, 130 Cal.Rptr. at 470, 550 P.2d at 1006 (emphasis added).

**22.** *Hodel* involved a *facial challenge* of the constitutionality of the Surface Mining Control and Reclamation Act of 1977.

their investment. *Pennell,* 485 U.S. at 13, 108 S.Ct. at 858.

The facial validity of a rent-control ordinance depends upon whether the regulatory scheme, in its entirety, permits an efficient landlord to receive a just and reasonable return on its investment. *Cromwell Assoc. v. Mayor of the City of Newark,* 211 N.J.Super. 462, 511 A.2d 1273, 1275 (1985); *see also Helmsley v. Borough of Fort Lee,* 78 N.J. 200, 394 A.2d 65, 70 (1978). Even if an ordinance has no express provision guaranteeing landlords a just and reasonable rate of return, such a provision must be implied if the ordinance is to pass constitutional muster. *Property Owners Ass'n v. Township of North Bergen,* 74 N.J. 327, 378 A.2d 25, 29 (1977), *citing Hutton Park Gardens v. Town Council of West Orange,* 68 N.J. 543, 569, 350 A.2d 1, 15 (1975).

The drafters of Ordinance 90–95 state that one of the Ordinance's purposes is to "provide a fair return for the lessor." The drafters also acknowledge the "intent and purpose of state law to set maximum renegotiated lease rentals at 'reasonable' levels." Rent control is unconstitutional if it is arbitrary, discriminatory, or demonstrably irrelevant to the legislature's professed purposes. *Id.,* 485 U.S. at 11, 108 S.Ct. at 857. An ordinance is unconstitutionally confiscatory if it is apparent from the face of the ordinance that its effect would be to lower rents more than is necessary for the stated legislative purpose or if it would preclude landlords from receiving a just and reasonable return on their property. *Birkenfeld v. City of Berkeley,* 17 Cal.3d 129, 165, 130 Cal.Rptr. 465, 491, 550 P.2d 1001, 1027 (1976).

■ Assessing the economic impact of Ordinance 90–95 and the extent to which it interferes with the reasonable investment-backed expectations of the plaintiffs, this court finds that the mere enactment of Ordinance 90–95 effects a regulatory taking of plaintiffs' property. As explained below, by indiscriminately and uniformly basing the maximum renegotiated rent on the initial rent paid under the lease *and by neglecting to provide any mechanism for adjustment or review,* the Ordinance operates to deprive lessors of a just and reasonable rate of return.

Ordinance 90–95 utilizes as its base the *rent charged during the first year of the lease.* In other words, the Ordinance determines the maximum allowable rent by multiplying the *total amount of rent paid by the lessee during the first year of the lease* by the "rent factor." The "rent factor," as explained above, is the average of the "inflation factor," which measures the rate by which prices have increased since the date the lease was entered into, and the "income factor," which measures the rate by which disposable income has increased since the lease was executed.

By basing the rent ceiling on the amount of rent paid by the lessee during the *first year of the lease,* the Ordinance does not allow lessors to collect rents reflective of market value. In many cases, a lessee will negotiate with the lessor to pay a low or nominal rent during the first year or so of the lease, after which the rent escalates considerably to market value. Plaintiffs have provided this court with several examples of cases where the rent charged during the first year of the lease was nominal, or at least considerably less than that paid in subsequent years. These situations arose when special lease terms were negotiated by the lessee in order to decrease its initial rent burden so that it could focus on repaying other debts during the first few months or years of the lease.

In support of its formula, the City reasons that rents should be allowed to increase at the same rate that prices and disposable income have increased since the date the lease was entered into. The City believes that by multiplying the rent paid during the first year of the lease by the same factor by which prices and income have increased, lessors will be allowed to collect "reasonable" rents.

The City's attempt to tie the growth of rents to the rate of increase of prices and income would most likely afford lessors a "reasonable" rate of return *if the rent paid during the first year of the lease was reflective of market value, or was at least "reasonable," at that time.* If such were

the case, the initial "reasonable" rent would be allowed to grow at a "reasonable" rate.

It is undisputed, however, that the rent paid by lessees during the first year of their leases is often far below market value. In fact, in negotiating certain leases, it is often the express intention of the lessor and lessee to provide for rent during the first year *far below market value* in order to allow the lessee to meet other financial obligations.[23]

As such, the base upon which the Ordinance measures the amount of rent growth allowable is arbitrary. If the City were to begin with a "reasonable" or "market value" rent for the year the lease was executed and then to allow *that amount* to grow at the same rate as prices and income, lessors would most likely be afforded a fair rate of return under the Ordinance. As written, however, Ordinance 90–95 does not operate in this manner. Instead, the Ordinance begins with a completely arbitrary number, a number often well below market value at the inception of the lease, and allows *that number* to grow at the same rate as prices and income. The result does not guarantee lessors a fair rate of return. The following examples illustrate this principle.

Plaintiffs are lessors of several properties in Honolulu. In their memorandum in support of the present motion, plaintiffs provide the court with examples of the Ordinance's effect on several of their leases. In order to calculate "rent factors" under the Ordinance, plaintiffs used CPI and DIC data from the year 1989.[24] Although plaintiffs claim the Ordinance is unconstitutionally vague as to which CPI to use, plaintiffs have used the CPI (All Items Combined) for All Urban Consumers ("CPI–U") for purposes of illustrating the operation of the Ordinance.

For example, plaintiffs calculated the "rent factor" to be 4.99 for Kalani–Iki Estates, one of the leasehold condominium projects owned by plaintiffs in Honolulu. The initial rent charged under the lease was one dollar ($1.00) for the first two years of the lease and was then raised to six thousand dollars ($6,000.00) for the next three years.[25] Memorandum in Support of Motion for Partial Summary Judgment ("Plaintiffs' Memorandum") at 15–16. Based on a "rent factor" of 4.99 and an initial rent of $1.00, the renegotiated rent could not exceed $4.99 per annum. This amount would be a small fraction of the current fair market rent being paid under the lease.

As a point of comparison, plaintiffs note that the lessees in turn have leased the premises out to First Federal Savings and Loan Association of America, which pays $12,840.00 per annum rent. Whether or not plaintiffs' calculations are entirely accurate, it is clear that by basing the maximum allowable renegotiated rent on the *initial rent paid under the lease,* the Ordinance does not allow plaintiffs a fair rate of return for Kalani–Iki Estates. Plaintiffs provide several other examples where the amount of initial rent paid is based on events unrelated to the market value of the property at the time the lease is entered into.

For example, under a particular Kahala Beach lease, no rent was to be paid until "the date of filing of [the] affidavit of publication or December 31, 1967, whichever occurs first." Plaintiffs' Memorandum at 19. As a result, the lessee paid $270.00 rent for the first year and $720.00

---

**23.** Both the City and the plaintiffs concede that this occurrence is common in the City and County of Honolulu.

**24.** Plaintiffs also contend that the Ordinance is unconstitutionally vague in that "it does not specify which CPI is used in any application of the formula." Plaintiffs' Memorandum at 81. Plaintiffs contend that there are numerous CPI's for Honolulu, for example, CPI (All Items Combined) for All Urban Consumers, CPI (All Items Combined) for Urban Wage Earners and Cleri-

cal Workers, CPI for All Urban Consumers (by Expenditures Category and Commodity and Service Group), CPI for Urban Wage Earners and Clerical Workers (by Expenditure Category and Commodity and Service Group), and CPI of Homeowners Equivalent Rent.

**25.** After the first five years and before the rent reopening scheduled for March 1, 1997, the $6,000.00 rent is increased according to a formula contained in the lease.

per annum for the following years. Based on the CPI–U for 1989, the "rent factor" is 4.48, and the maximum allowable renegotiated rent would be $1,209.60 per annum. Plaintiffs argue that this amount is not a fair rate of return on their property because "it is only $489.60 per annum ... more than what Plaintiffs have been receiving under the ... Lease for twenty-three years...." Plaintiffs' Memorandum at 19–20. Plaintiffs claim that it "is an absolutely inadequate return on beach front land in a prime Kahala location." *Id.*

Under the Kala Kai Marina lease, the rent was to be $1.00 per annum until the assignment of the lease and thereafter $160.00 per annum. The lease was assigned nine and one-half months through the first year; therefore, the lessees paid $34.13 rent the first year and $160.00 per annum thereafter. Again, based on the CPI–U for 1989, the "rent factor" is 5.28. This figure would yield a maximum allowable renegotiated rent of $180.15 per annum, an amount only $20.15 more than what plaintiffs would have received for the previous thirty years. Plaintiffs claim that this is an "absolutely inadequate return on residential land in a prime Hawaii Kai location." Plaintiffs' Memorandum at 21.

Similarly, the maximum allowable renegotiated rent for Executive Center, a mixed-use condominium project in downtown Honolulu,[26] would actually be *less* than that currently being paid by the lessee. Under the Master Lease, the initial rent paid was $200,000.00, and the amount currently being paid is $501,096.06. Based on the CPI–U for 1989, the "rent factor" is 1.63, and the maximum allowable renegotiated rent would be $326,000.00. This amount is $175,096.06 *less* than the current rent being paid by the lessee.

Plaintiffs assert that there are:

[O]ther condominium projects where the initial lease rents paid at the beginning of the respective leases were not established on the fair market value of the property but instead were established through negotiations with the developer because of financing, development, and construction considerations. These include, without limitation, leases with low rents for the first few months or years with varying increases to address the construction phase of development and leases with low rents for the first few months or years because of "buy-downs" by the developer.

Plaintiffs' Memorandum at 24.

It is clear, from the illustrations provided above, that a scheme arbitrarily basing the maximum allowable renegotiated rent on the initial rent charged under the lease does not in many cases allow the lessor a fair and reasonable rate of return. In some instances, the ceiling on renegotiated rent under the Ordinance is actually *less* than the current market rent being paid by the lessee. Furthermore, Ordinance 90–95 is fatally flawed in that it does not provide a mechanism for periodic review of the rent ceilings imposed in particular cases in order to ensure that lessors are continuously afforded a fair rate of return.

In *Birkenfeld,* an initiative amendment to the Charter of the City of Berkeley was held unconstitutional because it did not provide for regular review in order to ensure that lessors were recouping a fair rate of return.

[L]egislative guidance by way of policy and primary standards is not enough if the Legislature *"fail[s] to establish an effective mechanism to assure the proper implementation of its policy decisions."*

17 Cal.3d at 168–69, 130 Cal.Rptr. at 493, 550 P.2d at 1029, *quoting Kugler v. Yocum,* 69 Cal.2d 371, 71 Cal.Rptr. 687, 445 P.2d 303 (1968) (emphasis added). " 'When statutes delegate power with inadequate protection against unfairness or favoritism, ... the reviewing courts may well either insist upon such protection or invalidate the legislation.' " *Id.* at 169, 130 Cal.Rptr. at 493, 550 P.2d at 1029 (citations omitted).

The California Supreme Court struck down the amendment at issue in *Birken-*

---

26. Plaintiffs believe that the Ordinance should not apply to Executive Center because it is not clear whether it is a project "in which more than 50 percent of the floor space under cover is for residential purposes." *See* Ordinance 90–95 *and* Plaintiffs' Memorandum at 22.

*feld* because it "drastically and unnecessarily restricts the rent control board's power to adjust rent, thereby making inevitable the arbitrary imposition of unreasonably low rent ceilings." 17 Cal.3d at 169, 130 Cal.Rptr. at 493, 550 P.2d at 1029. The court noted that the amendment would impose a maximum rent for an *indefinite period* and held that without periodic review, "many or most rent ceilings would be or become confiscatory." *Id.* at 169, 130 Cal.Rptr. at 494, 550 P.2d at 1029. The court concluded that the amendment was unconstitutional because it provided no mechanism "by which the rent control board could adjust maximum rents without unreasonable delays...." *Id.* at 169, 130 Cal.Rptr. at 494, 550 P.2d at 1030.

Similarly, in *Cromwell Associates,* the court held that an ordinance placing a 25% limitation on annual rent increases was unconstitutional because the 25% limitation applied uniformly and indiscriminately, and there was no mechanism for adjustment in the event that a 25% increase would *not* provide a lessor with a fair rate of return. 211 N.J.Super. 462, 511 A.2d at 1275. The court conceded that in most cases, a 25% annual increase would not prevent lessors from recouping a reasonable rate of return, but the court invalidated the ordinance nonetheless because it did not provide for any *individualized consideration* of hardship. *Id.* Rent control limits "have been held valid [when they] provid[e] a safety valve, such as a hardship mechanism, ... which can assure an efficient landlord a fair return." *Id.* (citations omitted).

Like the charter amendment held unconstitutional in *Birkenfeld,* Ordinance 90–95 imposes a rent ceiling for an indefinite period of time. Furthermore, like the legislation invalidated in both *Birkenfeld* and *Cromwell Associates, Ordinance 90–95 also provides no mechanism for periodic review to avoid confiscatory results* in individual cases.

Because Ordinance 90–95 bases its rent ceiling on an arbitrary number, namely, the rent paid during the first year of the lease, and because the Ordinance does not provide any mechanism to ensure that its formula will yield a fair rate of return to lessors, the court concludes that the mere enactment of Ordinance 90–95 effects a taking of plaintiffs' property. In this court's view, the regulatory scheme outlined by Ordinance 90–95 does not allow plaintiffs to receive a just and reasonable return.

### c. Public Purpose

█ The legislative purpose behind Ordinance 90–95 is described in the Ordinance itself. Its professed purpose is to reduce "the cost of leasehold *housing* for the people of Hawaii." (Emphasis added.) The drafters claim that "the lease rents being obtained by lessors upon renegotiation ... have been too high and have *not* been reasonable." The Ordinance aims to provide "a formula for limiting the maximum renegotiated lease rent which would produce a rent that would 'be affordable to the lessee, be predictable, and provide a fair return for the lessor.'" The drafters state:

The council finds that although more than three-fourths of the 1,054,000 resident population of the State live in the City and County of Honolulu, Honolulu consists of only 9 percent of the total land area in the State. Approximately 11 percent of the total land area in Honolulu is classified for residential and apartment use. Due to this population pressure, the demand for residential land is greater in Honolulu than in other counties. Because of this high demand for residential lots in Honolulu and the continuation of the leasehold system, lessors are able to demand and get the maximum lease rents permitted under State law at the time of renegotiation....

In light of the foregoing, the council finds and declares that a social emergency of an immediate and continuous nature exists in the City and County of Honolulu such that it is necessary for the general health, safety and welfare of the people of the City and County of Honolulu that lessors of residential leasehold land situated in Honolulu be permitted to charge a maximum renegotiated lease rent for condominiums which is lower than that permitted for single-family homes under State law. To this end ... the council hereby enacts this ordinance.

**1493**

In *Hawaii Housing Authority v. Midkiff*, the United States Supreme Court directed courts to be extremely deferential in evaluating the legitimacy of an alleged public purpose. 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). "This Court will not substitute its judgment for a legislature's judgment as to what constitutes 'public use' unless the use is palpably without reasonable foundation." *Id.* at 241, 104 S.Ct. at 2329. The role for courts to play in reviewing a legislature's judgment of what constitutes a public use is an " 'extremely narrow' " one. *Id.* at 240, 104 S.Ct. at 2329, *quoting Berman v. Parker*, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).

Courts should defer to the legislature's "public use" determination unless " 'it is shown to involve an impossibility.' " *Midkiff*, 467 U.S. at 240, 104 S.Ct. at 2329, *quoting Old Dominion Land Co. v. United States*, 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162 (1925). "[W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Id.*, 467 U.S. at 241, 104 S.Ct. at 2329-30.

In light of the deferential standard articulated by the court in *Midkiff*, this court finds that Ordinance 90–95 does have a legitimate public purpose. "Judicial deference is required because, in our system of government, legislatures are better able to assess what public purposes should be advanced by an exercise of the taking power." *Midkiff*, 467 U.S. at 244, 104 S.Ct. at 2331. In fact, the exact same purpose articulated in Ordinance 90–95 was upheld as legitimate in *Midkiff*.[27]

The court must next determine whether that purpose is rationally related to the means chosen by the legislature. *Pennell*, 485 U.S. at 13, 108 S.Ct. at 858; *Midkiff*, 467 U.S. at 242, 104 S.Ct. at 2330; *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1280-81 (9th Cir.1987), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988). Rent control may be so irrational that it does not meet the public use requirement. *Hall*, 833 F.2d at 1280-81. An ordinance which does not substantially advance legitimate state interests violates the takings clause. *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141, *citing Nectow v. City of Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928). A restriction on real property may constitute a taking if it is not reasonably necessary to effect a substantial public purpose or if it has an unduly harsh impact on the owner's use of the property. *Penn Central*, 438 U.S. at 127, 98 S.Ct. at 2660-61.

In this case, the drafters of Ordinance 90–95 claim that their aim is to reduce "the cost of leasehold housing for the people of Hawaii" while providing "a fair return for the lessor." Unlike the statute upheld in *Midkiff*, the Ordinance does not reasonably further these goals. The "social emergency" described in *Midkiff* and incorporated by the drafters of Ordinance 90–95 focused on the shortage of available *housing* in Hawaii.

A study entitled, "Leasehold Conversion of Condominiums and Cooperative Housing Projects Phase I"[28] ("the Leasehold study") states that:

> Condominium purchases have been dominated by non-owner occupants, and not by individuals seeking home ownership. Only 31%, or approximately 16,400 of the leasehold residential condominium units in Hawaii, were owner occupied in 1984–1985.

---

27. "The people of Hawaii have attempted, much as the settlers of the original 13 Colonies did, to reduce the perceived social and economic evils of a land oligopoly traceable to their monarchs. The land oligopoly has, according to the Hawaii Legislature, created artificial deterrents to the normal functioning of the State's residential land market and forced thousands of individual homeowners to lease, rather than buy, the land underneath their homes. Regulating oligopoly and the evils associated with it is a classic exercise of a State's police powers." 467 U.S. at 241–42, 104 S.Ct. at 2330 (citations omitted).

The Ordinance states that the council "agrees with and incorporates by reference" the findings of the state legislature in enacting the "Land Reform Act" upheld in *Midkiff*.

28. A study prepared for the Housing, Finance and Development Corporation dated November 1987. At the hearing on the present motion, both parties indicated that the figures generated by this report are undisputed.

As pointed out by the plaintiffs, the Ordinance on its face applies to condominium units owned by investors, commercial condominium units in certain mixed-use buildings, hotel and transient vacation rental condominium units, parking apartment condominium units in residential and certain mixed-use buildings, and front desk and recreational condominium units in certain mixed-use buildings. In other words, not all the condominiums covered by the Ordinance are rented by lessees seeking residential housing. Even the Ordinance itself states that out of a total of 44,105 residential leasehold condominium units on Oahu, about 16,291 are owner occupied. These figures suggest that only 36.94 percent of all residential leasehold condominiums on Oahu are owner occupied.[29]

If the drafters of Ordinance 90–95 aimed to protect owner occupants, the Ordinance is constitutionally overbroad. It regulates not only the one-third of residential condominiums in Honolulu occupied by lessees, but also the two-thirds that are *not* occupied by lessees. Furthermore, with respect to that two-thirds, the Ordinance places no restrictions whatsoever on the rent that can be charged by sublessors to the actual tenants. Rather, the Ordinance applies *only* to renegotiated *annual ground rents*. In the majority of cases, it is the sublessees, not the lessees, who actually occupy the condominiums.

To the extent that the drafters intended to provide renters with more affordable housing, the approach chosen by the drafters of Ordinance 90–95 is not constitutionally rational. First, the Ordinance does not place any restrictions on rents charged to occupants by sublessors. Second, the terms of the Ordinance apply not only to residential condominiums but also to commercial condominiums.[30] Third, the Ordinance does not take into consideration the individual characteristics or market value of any piece of property in determining the maximum allowable renegotiated rent. Finally, no governmental agency has been designated to interpret the Ordinance, oversee its consistent application, or evaluate whether the rent ceiling is reasonable in every case.

By contrast, the statute upheld by the United States Supreme Court in *Midkiff* applied solely to residential lots, provided a case-by-case consideration of whether acquisition by the state of a particular tract of land would "effectuate the public purposes" of the Act, and determined the price to be paid for the tract not through a pre-determined formula but through a process of mandatory negotiation, with only an advisory compensation formulae. In fact, the compulsory compensation formulae included in the statute as originally drafted were struck down as unconstitutional.[31]

The statute upheld in *Midkiff* was the Land Reform Act of 1967 ("Act"), HRS ch. 516.[32] The Act was described by the Supreme Court as follows:

Under the Act's condemnation scheme, tenants living on single-family residential lots within developmental tracts at least five acres in size are entitled to ask the Hawaii Housing Authority (HHA) ... to condemn the property on which they live.... When 25 eligible tenants, or tenants on half the lots in the tract, whichever is less, file appropriate applications, the Act authorized HHA to hold a public hearing to determine whether

29. The parties do not dispute the figures cited in either the Leasehold study or the Ordinance itself.

30. The Ordinance applies to "all leases in the City and County of Honolulu for land appurtenant to residential condominium structures of any kind, or for land together with a condominium unit in said structure, including mixed-use buildings in which more than 50 percent of the floor space under cover is used for residential purposes." Ordinance 90–95.

31. *See* note 36, *infra.*

32. *Midkiff,* unlike the present case, involved the state's exercise of its eminent domain power. Less deference is due, however, when the state has *not* exercised its power of eminent domain but has merely enacted a regulation which is challenged as violative of the takings clause. *Hall,* 833 F.2d at 1280, *citing Midkiff,* 467 U.S. at 241, 104 S.Ct. at 2329–30. "It makes considerable sense to give greater deference to the legislature where it deliberately resorts to its eminent domain power than where it may have stumbled into exercising it through actions that incidentally result in a taking." *833 F.2d at 1280 n. 25.*

acquisition by the State of all or part of the tract will "effectuate the public purposes" of the Act.... If HHA finds that these public purposes will be served, it is authorized to designate some or all of the lots in the tract for acquisition. It then acquires, at prices set either by condemnation trial or by negotiation between lessors and lessees, the former fee owners' full "right, title, and interest" in the land.... After compensation has been set, HHA may sell the land titles to tenants who have applied for fee simple ownership.

*Midkiff,* 467 U.S. at 234, 104 S.Ct. at 2326.

As indicated by the court in *Midkiff,* the Land Reform Act of 1967 provided for a case-by-case consideration, which included public hearings, of *each decision to condemn a particular tract of land.* Ordinance 90–95, on the other hand, imposes an arbitrary rent ceiling on *every* condominium project deemed to fall within its coverage, with no individualized consideration whatsoever by any governmental agency. Under the Land Reform Act, the Hawaii Housing Authority had to make an explicit finding that "acquisition of [the] lands would effectuate the public purposes of the Act" before any lots would be condemned.

The Land Reform Act also applied *only to single-family residential lots.* As noted above, Ordinance 90–95 applies not only to residential condominiums, but also to commercial condominiums in mixed-use buildings.[33] The Land Reform Act is triggered when 25 eligible tenants, or tenants on half the lots in the tract, file applications with the HHA. An eligible tenant is "one who, among other things, owns a

house on the lot, has a bona fide intent to live on the lot or be a resident of the State, shows proof of ability to pay for a fee interest in it, and does not own residential land elsewhere nearby." As such, the Act is *narrowly tailored.*[34]

Ordinance 90–95, on the other hand, does not apply only to residential condominiums. As noted above, it applies to condominium units owned by investors, commercial condominium units in certain mixed-use buildings, hotel and transient vacation rental condominium units, parking apartment condominium units in residential and certain mixed-use buildings, and front desk and recreational condominium units in certain mixed-use buildings as well. Furthermore, even when the Ordinance does apply to residential condominiums, it does not address the problem of high rents being charged by sublessors to actual tenants. As such, the Ordinance places a disproportionate burden on lessors/landowners without regulating sublessors/individual apartment owners.[35] *First English Evangelical Lutheran Church,* 482 U.S. at 318–19, 107 S.Ct. at 2388; *Armstrong,* 364 U.S. at 49, 80 S.Ct. at 1569.

Third, as previously noted, in determining the price to be paid for any tract of land, the Land Reform Act provides for individualized consideration of the value of each tract of land to be condemned. As originally enacted, the Act directed the lessors and lessees to submit to compulsory arbitration if they could not agree on a price for the fee simple title. Notably, this District Court held the compulsory arbitration provision *and the compulsory compensation formulae* unconstitutional.[36]

---

**33.** The Ordinance states that it applies to "mixed-use buildings in which more than 50 percent of the floor space under cover is used for residential purposes." It does not exclude commercial condominiums from this definition.

**34.** The court notes, however, that this is not the constitutional standard. Ordinance 90–95 must be merely *rationally related* to the legislature's professed purposes.

**35.** Except, of course, in the minority of cases where the lessees themselves occupy the condominiums.

**36.** Judge Samuel P. King held that the amount paid to the lessor under the statute ("owner's

basis") must equal the property's fair market value. Decision on Motion for Preliminary Injunction, filed May 8, 1979, at 4. The statute as originally drafted set forth two formulae for determining just compensation and mandated that the formula which "gives the greater consideration to the lessee's interest" be utilized. Judge King struck the formulae as unconstitutional and upheld only the following language:

"Owner's basis" means the current fair market value of the lot. The fair market value shall be established to provide the lessor with just compensation for his interests in the lot and shall take into consideration every interest

*See Midkiff v. Tom,* 483 F.Supp. 62, 70 (D.Haw.1979), *rev'd on other grounds,* 702 F.2d 788 (9th Cir.1983). No appeal was taken from these rulings, and the state legislature subsequently amended the statute to require mandatory negotiation and to provide only *advisory* compensation formulae. *Midkiff,* 467 U.S. at 235 n. 3, 104 S.Ct. at 2326 n. 3.

If an ordinance provides for individual consideration of the particular circumstances of each case, then it will not be held to violate the fourteenth amendment.[37] *Pennell,* 485 U.S. at 13–14, 108 S.Ct. at 858. The ordinance upheld by the Supreme Court in *Pennell* provided for a hearing to determine the reasonableness of the proposed rent increase *in every case in which the tenant objected. Id.* at 5, 108 S.Ct. at 854. Unlike the ordinance upheld in *Pennell,* Ordinance 90–95, as the court has previously indicated, does not provide for any individualized consideration in fixing lease rent caps. The Ordinance provides no mechanism for obtaining variances or adjustments.

Finally, the Hawaii Housing Authority ("HHA") had substantial authority under the Land Reform Act to oversee the interpretation and application of the statute. The HHA held public hearings to determine whether the public purpose would be served by condemning each tract under consideration, and each lot within that tract. If the HHA found that the public purpose would be served by condemning a particular tract, then it could designate some or all of the lots in the tract for acquisition by the state.

After the land was acquired by the state, the HHA could sell the lots to the tenants. HHA was authorized to lend the tenants up to 90% of the purchase price, and it could condition final transfer on a right of first refusal for the first ten (10) years following sale. If HHA did not sell the lot to the tenant, it could lease or sell it to a third party after public notice. The HHA was also authorized to issue bonds and appropriate funds to use in acquiring the lands.

Ordinance 90–95 does not create any city agency to oversee the interpretation and application of the Ordinance, nor does it designate this function to any existing agency. Thus, there is no assurance that the "public purposes" of the Ordinance will be effectuated in any case in which it is deemed to apply. Furthermore, the only government agencies that can be called upon to settle questions regarding the application of the Ordinance are the courts.[38] This task could usurp judicial resources better devoted to other duties. *See Birkenfeld,* 17 Cal.3d at 169, 130 Cal.Rptr. at 494, 550 P.2d at 1030 (lessors have right to review and adjustment without unreasonable delay).

Based on the foregoing, the court concludes that although the professed public purposes of Ordinance 90–95 are legitimate, the approach chosen by the drafters to effectuate those purposes is not rational. *See Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). The court notes that a properly crafted ordinance may well pass constitutional muster.[39] "Rent control has long been held constitutional as a legitimate exercise of the state's police power." *Azul Pacifico, Inc. v. City of Los Angeles,* 740 F.Supp. 772, 781 (C.D.Cal.1990). Ordinance 90–95, however, does not rationally further the goal of reducing the cost of leasehold housing for the people of Hawaii while providing a fair return for lessors.

and equity of the lessee in establishing that market value.

**37.** "We accordingly find that the Ordinance, which so carefully considers both the individual circumstances of the landlord and the tenant before determining whether to allow an *additional* increase in rent over and above certain amounts that are deemed reasonable, does not on its face violate the Fourteenth Amendment's Due Process Clause." *Pennell,* 485 U.S. at 13–14, 108 S.Ct. at 858.

**38.** This point was conceded by counsel for the City at the hearing on this motion.

**39.** "[A] municipality can constitutionally enact rent control ordinances with stringent controls.... If it does so, however, it must be prepared to protect landlords' interests by providing prompt, fair, and efficacious administrative relief." *Helmsley,* 78 N.J. 200, 394 A.2d at 85–86.

### d. Just Compensation

■ When there is a taking, the fifth amendment mandates payment of the value of the property taken. *United States v. 15.65 Acres of Land*, 689 F.2d 1329, 1331 (9th Cir.1982), *cert. denied*, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 793 (1983); *United States v. 729.773 Acres of Land*, 531 F.Supp. 967, 974 (D.Haw.1982). "Just compensation" means the full monetary equivalent of the property taken. *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970). Compensation must equal the fair market value of the owner's leased fee interest.[40] *Midkiff*, 467 U.S. at 234 n. 2, 104 S.Ct. at 2325 n. 2.

The just compensation clause is designed not to limit governmental interference of property rights per se, but rather to secure compensation in the event of an otherwise proper interference amounting to a taking. *First English Evangelical Lutheran Church*, 482 U.S. at 315, 107 S.Ct. at 2385–86. A desire to promote public policy does not constitute justification for a state taking private property without compensation. *Sotomura v. Hawaii County*, 460 F.Supp. 473, 481 (D.Haw.1978).

If a court finds that an ordinance effects a taking, that the legislature's purposes are legitimate and public, and that the means chosen by the ordinance do *not* rationally further its purposes, then the court need not reach the issue of just compensation.

> In adjudicating a claim such as that presented by the [plaintiffs] the court must resolve three questions: (1) Did the governmental action amount to a taking of property? ... (2) Did it advance a legitimate governmental interest? ... (3) Was there just compensation? ... If the first question is answered in the affirmative and either of the remaining two in the negative, plaintiffs prevail....

*Hall*, 833 F.2d at 1275 (citations omitted).

In the present case, the court has found that Ordinance 90–95 is constitutionally infirm because it effectuates a taking and because its means are not rationally related to its otherwise legitimate legislative purposes. Because the Ordinance fails this test, the court does not reach the issue of just compensation.[41] *Hall*, 833 F.2d at 1274–75.

### e. Conclusion

In sum, the court finds that Ordinance 90–95 violates the takings clause of the fifth amendment of the United States Constitution. The Ordinance constitutes a taking because by arbitrarily basing the maximum allowable renegotiated rent on the initial rent paid under the lease, it does not allow lessors a just and reasonable rate of return.

Second, although the professed purposes of the drafters of Ordinance 90–95 are legitimate, the approach chosen by the Ordinance to effectuate those purposes is not rational. The Ordinance does not regulate the rent that can be charged by sublessors to tenants, nor does it apply to only residential condominiums. It does not provide for any individualized consideration of the market value of any particular condominium project, and it does not create or designate to any government agency the responsibility of interpreting and overseeing consistent application of the Ordinance. For these reasons, the court finds Ordinance 90–95 to be unconstitutionally overbroad.[42]

## CONCLUSION

For the foregoing reasons, the court hereby GRANTS plaintiffs' motion for partial summary judgment and DENIES the

---

**40.** The Land Reform Act upheld in *Midkiff* provided that upon a determination to condemn certain land, the price paid to the owner would be determined through mandatory negotiation. The issue of compensation was not before the court in *Midkiff*. 467 U.S. at 234 n. 2, 104 S.Ct. at 2325–26 n. 2. The court noted, however, the "weighty demand of just compensation." 467 U.S. at 245, 104 S.Ct. at 2332.

**41.** The court notes, however, that it has already found that the Ordinance does not afford lessors a just and reasonable rate of return and therefore effects a taking.

**42.** Because the court has found Ordinance 90–95 to be an unconstitutional taking without just compensation, it is not necessary to address plaintiffs' due process, contracts clause, or 42 U.S.C. § 1983 claims.

City's motion to dismiss or abstain or, in the alternative, for summary judgment, or in the further alternative, for relief under Rule 56(f).

IT IS SO ORDERED.